# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

LEJO "LEE" BAHAM                          *CIVIL ACTION NO. 6:06-2372

VS.                                       *MAGISTRATE JUDGE HILL

NABORS DRILLING USA, LP, ET AL.           *BY CONSENT OF THE PARTIES

## REASONS FOR JUDGMENT

The non-jury trial of this case before the undersigned Magistrate Judge commenced on June 23, 2009 and concluded on June 26, 2009.[1]  Thereafter,  the Court took this case under advisement.

## STIPULATIONS

The Pre-Trial Order contains the following joint stipulations:

1.  The Dolphin 109 was a vessel operating on the Outer Continental Shelf (OCS) at the time of plaintiff's injuries;

2.  At the time, the Dolphin 109 was attached to the seabed, by its legs and risers and casing, through which it was in the process of running coil tubing.

At trial the parties entered the following joint stipulations:

1.  That Seabright Insurance Company ("Seabright"), Seatrax Services, Inc.'s longshore and harbor workers' compensation insurance carrier, paid medical expenses in the total amount of $68,599.89, indemnity payments (through the date of trial) in the amount of $11,800.00.

2. That Seatrax Services, Inc. ("Seatrax") paid wages in the gross amount of $106,810.00 and the net amount of $90,025.06, to, and or on behalf of, Baham.

---

[1]All parties consented to the Court's jurisdiction being exercised by the undersigned pursuant to 28 U.S.C. § 636(c).

3. That the indemnity payments made by Seabright to, and or on behalf of, Baham, were reasonable and necessary and incurred as a result of the injuries sustained in the September 14, 2006 accident.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After due consideration of the facts and evidence which was presented by the parties at the trial of this matter through live witnesses, exhibits and deposition testimony, and having had the opportunity to assess the demeanor of the live witnesses, and review and weigh the evidence, this Court hereby makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, which the Court finds and holds were established by a preponderance of the evidence.[2]

## FINDINGS OF FACT - Liability

On September 14, 2006, Lejo Baham ("Baham") was employed by Seatrax Services, Inc. ("Seatrax") as a crane mechanic.  On that date, Baham was sent to the Dolphin 109, a jackup drilling rig owned by Nabors Offshore Corporation ("Nabors") and located on the OCS, to inspect and  possibly repair the port-side crane on the rig.  Baham had never been on the Dolphin 109 prior to that date.

The port-side crane sits on a pedestal. The sole means of ingress and egress to the crane is via a ladder which provides access to an open-grated grey steel walkway (which surrounds the crane pedestal) through an opening in the floor of the walkway.  To access the crane cab, an individual must climb from the walkway by another ladder into the crane cab.

---

[2]To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

2

The walkway is situated below the cab of the crane, and is approximately fourteen feet above the deck.  According to plaintiff's safety expert, Jack R. Barnidge, the walkway is approximately five feet wide, and the opening in the middle of the floor of the walkway (for access from the ladder) is approximately thirty inches wide.  The opening in the walkway can be guarded or secured by means of a cover which is made of the same grated grey metal as is the walkway.

The cover is opened and closed manually.  It has no mechanism to automatically close after being opened.  When in the open position, the top of the cover rests on guardrails surrounding the ladder opening, and rests to the back of a person climbing on to the walkway from the ladder.  The cover is the same grey color as the deck below.  For these reasons, the cover blends in with the surrounding walkway and deck below, making it not readily noticeable to persons, like Baham, who are not familiar with the crane.

The Dolphin 109 was the only rig in the Nabors fleet with this type of ladder and walkway configuration, and, according to Nabors operations manger Joseph Menard ("Menard") and safety expert Barnidge, this configuration is not a usual configuration in the oil industry.  The Court accepts their testimony, and to the extent that Seatrax safety coordinator Robert Watson testified to the contrary, the Court rejects his testimony on this point.

After arriving at the rig, Baham met with Nabors rig medic and safety coordinator, Larry Brown ("Brown"). Brown verified that Baham had his personal protection equipment (PPE) with him.  Brown also conducted a basic safety orientation with Baham, advising Baham

3

about emergency and evacuation procedures, fire alarms, the location of life boats and life rafts, and the location of the galley and sleeping quarters.  However, no specifics regarding the crane, the ladder leading to the crane or the walkway around the crane pedestal were discussed.

Baham next met with Nabors tool pusher David Prather.  Baham's testimony of what transpired thereafter differs greatly from that given by Prather.  The Court finds the version of events given by Prather was not credible, and, accordingly, the Court rejects his testimony.  According to Baham, who this Court finds credible on this issue, he and Prather left Prather's office to go to the galley to get coffee.  They then went to the smoking area where they sat on a swing.  While walking to the galley, and while sitting in the smoking area, Prather and Baham discussed the problem with the crane, which necessitated Baham's inspection.  Prather related that there had been a loud popping in the crane, and Baham advised that he would need to look at the swing gear, gearbox, the wenches and wire rope and sheaves.  Prather and Baham did not discuss any hazards associated with the crane, ladder or walkway surrounding the crane pedestal.  The discussion lasted approximately ten to fifteen minutes.

While the two (Baham and Prather) were drinking coffee and smoking, Prather was called to the crane by Nabors rig electrician Harlan Wesley Parker, Jr. ("Parker"), who was already in the crane cab looking at the crane load chart.

Prather testified that he told Baham to wait for him (Prather) to return to the living quarters to perform a JSA prior to beginning work.  The Court, however, finds Prather's testimony on this point not credible.  Baham testified that he told Prather that he would finish his cigarette and meet Prather on the crane; Prather agreed and voiced no objection.  The Court

accepts Baham's testimony as credible on this crucial point.

Thus, Baham had authority to ascend the ladder to the crane and to begin his inspection, without first completing a JSA, as soon as he finished his cigarette.  Indeed, accepting the facts found by this Court, Menard agreed that Prather authorized Baham to do exactly as he did.

The Seatrax safety coordinator, Watson, whose testimony was, for the most part, unfavorable to Baham's position, agreed that if Prather told Baham to come to the crane after finishing his cigarette, Baham did not do anything wrong, as the toolpusher is the "master of the vessel." Baham's testimony on this point is supported by the September 27, 2006 email of Richard Grayson, the head of safety for Nabors in Houston, Texas, which states that the toolpusher, Prather, "allowed the mechanic to come up behind him and begin inspecting the underside of the crane . . . ."  Following Baham's accident, as further disclosed by Grayson's email, Prather was "counseled" by his supervisor, Menard, for allowing Baham to proceed unescorted to the crane.

Prather ascended the ladder and went into the crane cab.  Both Brown and Menard testified that it was the policy of Nabors for employees to immediately replace the steel grating cover over the opening in the walkway after passing through the opening, no matter how short a period of time the employee was to remain in the crane.  The Court accepts, as credible, this testimony.  However, after passing through the opening in the floor of the walkway, Prather did not close the cover over the opening.  Prather was the last person to ascend the crane through the opening in the walkway prior to Baham's ascent.

5

After finishing his cigarette, as authorized by Prather, Baham went to the crane and ascended the ladder to the grated steel walkway surrounding the crane pedestal.  This also was in violation of Nabors' policy which, according to Menard, required Prather to escort Baham to the crane.  The cover was in the open position when Baham passed through the opening; Baham did not close the cover over the walkway opening after passing through the opening.

Although several Nabors employees testified that the cover for the walkway opening could be seen while ascending the ladder to the walkway, the Court accepts Baham's testimony that he did not see the cover, and that he was therefore unaware of its existence.  Baham's testimony on this point is supported by the Nabors root cause analysis which lists as a contributing cause of the accident, Baham's unawareness that the hatch had been left open.

Baham had never been on the Dolphin 109 previously and, therefore, was not aware of the unusual configuration of the ladder and walkway.  As Baham climbed the ladder through the opening, the open hatch cover was to his back.  Furthermore, both the hatch cover and the walkway were made of the same grey metal grating. This allowed the cover to blend in with the surrounding grating of the walkway and the grey colored floor of the deck below.  Although defense work-safety expert Howard testified that Baham should have seen the cover, the Court does not accept Howard's testimony on this point, as his opinion in this case appears contrary to an opinion he rendered in another case (the "Tabor" case), and is not supported by the photographs admitted at trial.

6

After passing through the walkway opening, Baham proceeded to walk on the walkway surrounding the crane pedestal for two to three minutes.  During this interval, Baham was inspecting the crane's swing gear which required him to look above him.  He did not look down at the walkway.  As he was walking, Baham stepped into the opening in the floor of the walkway, which he had just passed through, and which had been left uncovered by Prather.  Baham fell approximately fourteen feet to the deck below.  As Baham was lying on the deck, he saw the cover for the opening for the first time.  At the time of his fall, both Prather and Parker were in the crane cab.

Baham claims that while he was lying on the deck, someone told him that another person had fallen from the walkway and broken his leg.  However, neither Brown nor Menard, who the Court found credible on this issue, testified that there had been any prior accident involving the port-crane walkway opening.  Moreover, Baham was admittedly not "alert or well oriented" when he claims to have heard this comment.  Therefore, the Court finds that there is no credible evidence in this case that such an accident occurred.

After lying on the deck for approximately two hours, Baham was taken by helicopter to Ochsner Hospital in New Orleans.  While in the helicopter, Baham was given a morphine injection.  After arriving at the hospital, while in the emergency room, Baham spoke with Tim Westerman, safety advisor for Energy Partners. Baham told Westerman that he forgot to close the cover over the floor opening. This statement is factually accurate; it does not necessarily mean that Baham saw the hatch cover before the fall. Baham made the comment after seeing the hatch cover for the first time while lying on the deck floor after his fall. Moreover, the

7

Court accepts Baham's explanation of why the comment was made; he was on pain medication and concerned about losing  his job.

## CONCLUSIONS OF LAW-Liability

This Court has jurisdiction over Baham's claim against Nabors under its Admiralty and Maritime jurisdiction, 28 U.S.C. § 1333, and under 33 U.S.C. § 905(b) and (c), made applicable to Baham by 43 U.S.C. § 1333(b).  Venue in this court is proper and uncontested.

The Court finds that Baham is an LHWCA-covered employee.  The Dolphin 109 is a maritime (OCSLA) situs and Baham was injured in while performing a maritime activity.

Recovery for injury to a person, other than a Jones Act seaman, working on the Outer Continental Shelf is governed by the LHWCA, 33 U.S.C. §§ 901-950 (1982).  *Lormand v. Superior Oil Company,* 845 F.2d 536, 541 (5th Cir. 1987).  Section 905(b) of the LHWCA permits a worker to recover from a vessel owner for personal injury "caused by the negligence of [the] vessel." 33 U.S.C. § 905(b);  *Lormand,* 845 F.2d at 541.  The right to pursue a negligence action against the owner of a vessel under section 905(b) of the LHWCA is exclusive of other theories of recovery.  *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 165, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981);  *Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243, 1246 (5th Cir.1981).  For such negligence to have occurred, however, the vessel owner must have violated a  legal or statutory duty of care owed to the injured worker. *Lormand,* 845 F.2d at 541; *See also Kernan v. American Dredging Company*, 355 U.S. 426, 432, 78 S.Ct. 394 (1958).

***Scindia* Negligence**

In the context of liability under the LHWCA by a vessel owner for injury to a stevedore's employee working aboard the vessel, the Supreme Court has articulated several principles that govern the scope of the vessel owner's duty of care. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Although *Scindia* discussed the respective duties of a vessel owner and stevedore, subsequent Fifth Circuit jurisprudence has made it clear that the rationale of *Scindia* applies equally to questions of vessel owner liability for injuries to LHWCA-covered employees of an independent contractor working aboard the vessel. *Lormand v. Superior Oil Company,* 845 F.2d 536, 541 (5th Cir. 1987) *citing Hill v. Texaco, Inc*., 674 F.2d 447, 451 (5th Cir.1982); *Manuel v. Cameron Offshore Boats, Inc*., 103 F.3d 31, 33 (5th Cir.1997).

Thus, the distribution of duty between a vessel owner and stevedore outlined in *Scindia* also governs the scope of Nabors' duty, as owner of the Dolphin 109, to Baham, an LHWCA-covered employee of an independent contractor, Seatrax, who was injured while working aboard the Dolphin 109, a jackup drilling rig engaged in oil and gas operations located on the OCS.

The Court in *Scindia* delineated three duties owed by a vessel owner.  These duties include (1) the "turnover duty," (2) the "active control duty," and (3) the "duty to intervene." *Moore v. M/V ANGELA*, 353 F.3d 376, 380 (5th Cir.2003) *citing Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994) (internal citation omitted).

9

**Active Control Duty**

In this case, Baham contends that Nabors violated the second *Scindia* duty.  Under the second *Scindia* duty, a vessel owner may be liable for injuries if it (1) "actively involves itself in the . . . operations and negligently injures a longshoreman," *or* (2) fails to exercise due care to protect longshoremen "from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation . . . ." *Scindia*, 451 U.S. at 167. Liability based on this duty is not relieved when the hazard is open and obvious.  *Pimental,* 965 F.2d at 16;  *Masinter*, 867 F.2d at 897-898 ("obviousness, though relevant to the first exception, bears no significance to a vessel owner's duty under the second exception.").

In the present case, Baham focuses on the second part of the duty, the alleged failure to exercise reasonable care in areas or equipment remaining under the active control of the vessel. More specifically, Baham contends that this is not a case where the vessel owner, Nabors, relinquished complete control over the ladder or the walkway containing the access hole through which he fell, but, rather, that Nabors retained control over this equipment.

The Fifth Circuit has described the requisite control under the second *Scindia* duty as being akin to "operation control" at the time of the activities in question. *See Manuel*, 103 F.3d at 34*; see also Howlett v. Birkdale Shipping Co.,* 512 U.S. 92, 104-105, 114 S.Ct. 2057 (1994) ("The vessel's responsibilities . . . are commensurate with its access and control . . . . Because the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow, its duties with respect to the stow are limited by comparison.").

10

The second *Scindia* "duty recognizes that although a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew retains operational control." *Manuel*, 103 F.3d at 34 *citing Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13 (5th Cir. 1992); *Masinter v. Tenneco Oil Co.*, 867 F.2d 892 (5th Cir. 1989).  If the vessel relinquishes control over an area or a piece of equipment to the stevedore, the active control duty is extinguished. *See Pimental*, 965 F.2d at 16.  Moreover, if "a vessel has relinquished control over an area to the stevedore, then it is the primary responsibility of the stevedore to remedy a hazard in that area." *Id. citing Turner v. Costa Line Cargo Services, Inc.*, 744 F.2d 505, 512-513 (5th Cir. 1984).

In the present case, although Baham had begun his inspection of the underside of the crane, Baham never had complete control over the ladder and walkway in question.  To the contrary, this equipment remained in the control of Nabors at the time of Baham's accident.  Nabors employees were never denied access to the crane via the ladder or pedestal walkway during Baham's inspection.  Indeed, although the crane was not being operated at the time of Baham's accident, both Parker and Prather had ascended the ladder and were inside the crane cab when Baham fell through the walkway opening.

Furthermore, Baham was not to perform any inspection of, or work on, either the ladder or the pedestal walkway; his sole assignment was to inspect, and then possibly repair the *crane*. The ladder and walkway surrounding the crane pedestal were simply the means by which

11

Baham could access the crane to perform his assigned task.  Nabors retained operation control over this equipment (ladder and walkway) during Baham's inspection.

This conclusion is also supported by the preponderance of credible testimony which indicated that Nabors, through its toolpusher, Prather, retained ultimate control and authority over, not only the ladder and walkway in question, but also the crane itself.  Parker testified that Baham did not have authority to tell Nabors employees to get on or off the crane, or to permit or deny Nabors employees access to the crane.  Menard likewise testified that Prather had "the say so" as to what happens and what takes place on the crane and the crane pedestal. He further testified that Baham could not give orders regarding work on, or associated with, the crane, but, rather, could only give recommendations for such work, which work could not then be performed in the absence of authorization by Nabors.  Thus, because Nabors retained operational control over the ladder and walkway in question, Nabors may be found liable to Baham for their hazardous condition.

The evidence demonstrated that, at the time of Baham's accident, the configuration of the ladder and walkway through which Baham fell constituted an unreasonable risk of harm to Baham.  The steel grating, which was to cover the opening in the walkway, had been left open by Prather, thus allowing Baham to fall through the unsecured opening.  Moreover, this hazardous condition was created by Nabors' employee, Prather, who was the last person to ascend the ladder prior to Baham.   The Court accepts, as credible, the testimony of both Brown and Menard, who testified that it was the policy of Nabors for employees to

immediately place the steel grating cover over the opening in the walkway after passing

through the opening, no matter how short a period of time the employee was to remain in the

crane.  Thus, Prather clearly should have closed the grating cover to secure the opening in the

walkway, after he passed through the opening.

Finally, given the testimony of Brown and Menard, Nabors should have been aware that

leaving the grating cover in the open position constituted a hazardous and dangerous condition

which could result in a fall through the unprotected opening.  Indeed, Menard candidly agreed

that the reason for the Nabors policy and API and ANSI standards, suggesting that openings in

floors be closed or guarded when not in use, is to prevent workers from falling through the

opening.  Thus, Nabors did not exercise due care to protect Baham, but rather exposed Baham

to this hazardous condition.

For these reasons, the Court finds that Nabors was negligent, as it breached its duty to

avoid exposing Baham to harm from hazards under the control of the vessel.

This failure by Nabors, which constituted negligence, was a proximate, legal and factual

cause of Baham's injury and resulting damages.  Had Prather not left the opening unsecured

and uncovered by replacing the steel grating cover over the opening in the walkway, Baham

would have unquestionably been aware of the existence of the steel grating cover, as he would

have had to have lifted the cover off of the opening as he ascended the ladder.  Thus, he would

have been prompted to replace the cover after stepping onto the walkway surrounding the

crane pedestal, which, in turn, would have prevented the accident.

13

**Turnover Duty**

The Court will briefly discuss the fist *Scindia* duty because the defendant has argued and presented evidence against application of the duty. "The 'turnover duty' relates to the condition of the ship upon the commencement of stevedoring operations." *Moore v. M/V ANGELA*, 353 F.3d 376, 380 (5th Cir. 2003) *citing Scindia*, 451 U.S. at 167.

This duty places two responsibilities on the vessel owner. First, the owner owes a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety. *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 392 (5th Cir. 2008) *citing Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-17 & n. 18, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969).   The first turnover duty, to provide a safe ship, does not include conditions which are open and obvious. *Id*. at 394-395 *citing Howlett* and *Riggs v. Scindia Steam Navigation Co.*, 8 F.3d 1442 (9th Cir. 1993) and *Clay v. Diachi Chhuo (America), Inc.*, 74 F.Supp.2d 665 (E.D.La. 1999), *aff'd*, 237 F.3d 631 (5th Cir. 2000).

Second, the owner owes a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it; however, the duty to warn of hidden dangers is narrow. *Id. citing Howlett*, 512 U.S. at 99-100.  It does not include dangers which are either: (1) open and obvious, or (2) dangers a reasonably competent stevedore should anticipate encountering. *Id. citing Howlett*, 512 U.S. at 100-101.

A  narrow exception to the open and obvious bar to liability under the turnover duty applies "if the longshoreman's only alternatives to facing the hazard are unduly impracticable or time-consuming or would force him to leave the job." *Id.* at 396 *citing Moore v. M/V ANGELA*, 353 F.3d 376, 380-381 (5th Cir. 2003) (other citations omitted).   The Fifth Circuit has generally applied this exception where the dangerous condition existed in the ship's equipment or was otherwise created by the shipowner through its negligence.  *Id.* (citations omitted).

Nabors argues that the condition of the walkway was open and obvious, thus, the turnover duty was not breached. The Court finds however, that, for purposes of the turnover duty, while the opening in the walkway was open and obvious, which a crane repairman of reasonable competence should have seen, the open condition of the grated walkway cover was not.  When left open, the metal grey grating cover for the opening rested to the back of a person climbing the ladder and blended in with the gray grated floor of the walkway, making it difficult to see.

Prather clearly left the cover in the open position prior to the commencement of Baham's inspection.  For those reasons discussed in relation to the active control duty, Nabors did not exercise ordinary care under the circumstances to turn over the ship's equipment (ladder and walkway) in such condition that a crane mechanic, such as Baham, could carry on his crane inspection with reasonable safety.  Thus, Nabors breached the first responsibility imposed under the turnover duty.

15

Moreover, for those reasons discussed in relation to the active control duty, Nabors negligence in failing to exercise ordinary care under the circumstances to turn over the ship's equipment (ladder and walkway) in such condition that a crane mechanic, such as Baham, could carry on his crane inspection with reasonable safety, was a proximate, legal and factual cause of Baham's injury and resulting damages.

**Duty to Intervene**

Neither the parties nor the record suggest that the third *Scindia* duty is an issue in this case. Accordingly, the Court will not discuss this duty.

**Negligence *per se***

Plaintiff also seeks to impose liability on the basis of the violation of a statutory duty under a theory of negligence *per se*. Specifically, Baham asserts that Nabors violated Coast Guard regulation 33 C.F.R. § 142.87, setting forth the duty to cover, guard or otherwise make inaccessible deck openings when not in use to prevent a person's foot or body from inadvertently passing through the opening.

"Negligence *per se* . . . is a theory by which statutes are used to establish the appropriate standard of care." *Gray ex rel. Rudd v. Beverly Enterprises-Mississippi*, 390 F.3d 400, 407 (5th Cir. 2004). "When the doctrine of negligence *per se* applies, [the legal] standard of care . . . is replaced by a specific rule of conduct established in a statute or regulation." *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 235 (5th Cir. 1983) (internal citations omitted). "To say that violation of a statute is negligence *per se* is to say that 'an un-excused violation is conclusive on the issue of negligence' . . ." as to the party in violation. *Lowe v. General Motors*

16

*Corp.*, 624 F.2d 1373, 1380 (5th Cir. 1980) *quoting* W. Prosser, Law of Torts at 200 (4th ed. 1971).  However, the statutory violation says nothing about the comparative negligence of others.

A vessel owner may be liable under the doctrine of negligence *per se*, if its violation of a statutory duty causes injury to a worker covered under the LHWCA.  *See Abruska v. Northland Vessel Leasing Co.*, 258 Fed.Appx. 158, 160 (9th Cir. 2007); *Duty v. East Coast Tender Service, Inc.,* 660 F.2d 933, 947 (4th Cir. 1981).  In order to establish liability under the doctrine of  negligence *per se*, the injured worker must show the following: (1) a violation of a Coast Guard regulation, (2) the plaintiff's membership in the class of intended beneficiaries of the regulation, (3) an injury of a type against which the regulation is designed to protect, (4) the un-excused nature of the regulatory violation, and (5) causation.  *Smith v. Trans-World Drilling Co.,* 772 F.2d 157, 160-61 (5th Cir. 1985) *citing Reyes v. Vantage S.S. Co., Inc.,* 558 F.2d 238, 242-44 (5th Cir. 1977), *modified*, 609 F.2d 140 (1980).  *See also Fuszek v. Royal King Fisheries, Inc.*, 98 F.3d 514, 517 (9th Cir. 1996) *citing Smith, supra*.

Because Nabors is the owner and operator of the Dolphin 109, a jack-up drilling rig which performs drilling operations on the Outer Continental Shelf, Coast Guard regulation 33 C.F.R. § 142.87 applies to Nabors.  33 C.F.R. § 142.4.  The language of § 142.87 establishes that the regulation is designed to protect workers on facilities located on the Outer Continental Shelf, such as Baham, from inadvertently falling through an uncovered, unguarded or otherwise accessible deck opening, as Baham did in this case.  These findings were also

17

confirmed by both work safety experts who testified at trial, Jack R. Barnage and Dennis Raymond Howard.

 As a result of his inadvertent fall through the uncovered opening, Baham established that he suffered an injury to his ankle, which is the type of injury against which the regulation is designed to protect.

Moreover, the evidence demonstrated that Nabors violated the regulation when its employee-toolpusher, Prather, left the walkway cover in the open position, after he had ascended through the opening and continued on into the cab of the crane.

The violation cannot be deemed excused given that Nabors' employees (Brown and Menard) agreed that the walkway cover should *always* be placed over the opening in the walkway immediately after an employee passes through the opening.  This is particularly true in this case, given that Prather should have known that Baham would thereafter be ascending the ladder and using the walkway to inspect the crane pedestal, as this had been previously discussed by them during their meeting on the deck of the rig while drinking coffee and smoking.

Finally, the violation of the regulation was a proximate, legal and factual cause of Baham's fall and resulting injuries.  Had Prather not left the walkway cover in the open position, Baham would have been in a better position to discover the cover and subsequently cover the opening after he ascended through it.

Thus, Nabors was negligent *per se* under the cited regulation, 33 C.F.R. § 142.87.

**ANSI and API Standards**

Plaintiff also seeks to impose liability on the basis of the violation of ANSI and API standards under a theory of negligence *per se.* Violations of ANSI and API standards are not bases for negligence *per se* as they are not legislative enactments, laws or regulations. *See Melerine v. Avondale Shipyards*, Inc., 659 F.2d 706, 709 (5th Cir. 1981) (requiring a "legislative enactment" to establish negligence *per se*).  Nevertheless, in some cases, those standards might be applicable to establish the standard of care under a general negligence analysis. *See Dixon v. International Harvester Co.*, 754 F.2d 573, 581-82 (5th Cir. 1985); *Rabon v. Automatic Fasteners, Inc.*, 672 F.2d 1231, 1238 (5th Cir. 1982); *Melerine*, 659 F.2d at 710-12.

Plaintiff cites ANSI A1262, issued in 1995, and API recommended practice 54, third edition, issued in 1999, regarding ladderway and floor openings.  The Court agrees with defense safety expert Howard, that it would be inappropriate to apply these standards, both of which post-date the construction of the Dolphin 109 by approximately thirty years, to the Dolphin 109, in the absence of any major alterations to, or use changes of, the Dolphin 109. As such, these standards will not be considered by the Court as establishing the standard of care due by Nabors with respect to the ladder-walkway opening on the Dolphin 109 at time of Baham's accident.  Moreover, it appears to the Court that these standards merely set forth a matter of common sense, that openings in ladderways and floors should be guarded or secured when not in use to prevent inadvertent falls through the unprotected and unguarded hole.

**Comparative Negligence**

In § 905(b) actions, evidence of the plaintiff's own negligence may be presented to reduce the plaintiff's damages through application of pure comparative fault principles. *Theriot,* 783 F.2d at 536; *see also Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753 (1979);  Thomas J. Schoenbaum, Admiralty and Maritime Law, § 7-10, pg. 472 (4th ed. 2004). The standard to be used in determining plaintiff's conduct is that of a reasonably prudent person under similar circumstances. *Walden v. United States*, 31 F.Supp.2d 1230, 1235 (S.D. Cal. 1998) *citing Almarez v. Universal Marine Corp*., 472 F.2d 123, 124 (9th Cir. 1973).

Although plaintiff asserted, by pre-trial motion *in limine,* that his comparative negligence could not be considered by this Court because Nabors violated Coast Guard regulations, the Court's ruling on that motion rejected this argument.  As Baham is not a seaman covered under the Jones Act, he is not entitled to the benefit of  the rule barring application of contributory negligence and resultant diminution of damages set forth in section 53 of FELA, which provisions have been statutorily made applicable to seaman covered under the Jones Act.  *Neal v. Saga Shipping Co., SA*, 407 F.2d 481, 485-486 (5th Cir. 1969) (finding that FELA § 53 did not operate to preclude assessment of contributory negligence and diminution of damages because the plaintiff was not a Jones Act seaman) and *Roy Crook and Sons, Inc. v. Allen*, 778 F.2d 1037, 1039-1040 (5th Cir. 1985) (distinguishing *Neal* on the basis that the plaintiff was a Jones Act seaman).  Accordingly, the Court will consider Baham's

comparative fault.

The Court finds that Baham was comparatively negligent and at fault for his accident and resultant injuries, and that 50 percent of the total fault should be attributed to him. Therefore, his damages will be reduced by 50 percent of the total damages.

As the Court previously found, while the open condition of the grated walkway cover was not open and obvious, the opening in the walkway itself was.  Moreover, notwithstanding Baham's testimony to the contrary, the Court finds that Baham was aware that there was an unsecured and unguarded opening in the walkway, as the evidence clearly established that Baham had just climbed through the opening prior to his fall.  Indeed, common sense requires this finding.

Armed with this knowledge, even though Baham may not have been able to easily discover the metal cover for the opening in order to close it, he should nevertheless have proceeded with reasonable care to avoid walking into the unsecured and unguarded hole through which he had just passed.  Baham failed to use reasonable care while walking around the walkway of the crane pedestal.  Baham was looking up at the crane and pedestal as he walked around the walkway, apparently he forgot about the opening or simply failed to look where he was stepping.  Baham's failure to use reasonable care under the circumstances constitutes negligence, and that negligence was a proximate, legal and factual cause of Baham's injuries and resulting damages.

In light of the above, the Court finds that Nabors and Baham were equally at fault for Baham's accident and resultant injuries.  As such, 50 percent fault is assigned to each.

**CONCLUSIONS OF LAW - Damages**

In actions brought under § 905(b), an injured LHWCA covered employee may recover those items of damages which are recoverable under the general maritime law, including monetary recovery for past and future loss of earning capacity and wages, past and future medical expenses, and pain and suffering resulting from an injury caused by the defendant's negligence.  Thomas J. Schoenbaum, Admiralty and Maritime Law, § § 7-10 and 5-15 (4th ed.2004); *Kirksey v. P&O Ports Texas, Inc*., 488 F.Supp.2d 579, 591 (S.D.Tex. 2007) *citing Williams v. Chevron USA, Inc*., 875 F.2d 510, 506 (5th Cir. 1989).

Future medical expenses are estimated on the basis of medical testimony. Thomas J. Schoenbaum, Admiralty and Maritime Law, § §  5-15.2 (4th ed. 2004); *see also Sosa v. M/V/ Lago Izabal*, 736 F.2d 1028, 1033 (5th Cir. 1984).

With the exception of awards for future pain and suffering, future losses (income and medical expenses) must be discounted to present value.  *Kirksey,* 488 F.Supp.2d at 591 *citing Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983); Thomas J. Schoenbaum, Admiralty and Maritime Law, § §  5-15.1, 2 and 3  (4th  ed.2004).

Future lost income must be computed on net after-tax value. *Kirksey,* 488 F.Supp.2d at 591 *citing Norfolk & W. Ry. v. Liepelt*, 444 U.S. 490, 493-494, 100 S.Ct. 755 757-758 (1980); Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.1 (4th ed. 2004).

Past lost wages are usually measured by the actual wage losses incurred by the plaintiff from the date of the accident to the date of trial. Thomas J. Schoenbaum, Admiralty and Maritime Law, §  5-15.1 (4th ed. 2004).  The sum is determined by calculating the amount of

money the plaintiff would have earned had he continued at his pre-accident employment, less any wages he earned since the accident.  *Blaauw v. Superior Offshore International, LLC*, 2008 WL 4224808, *17 (W.D. La. 2008).

The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983) (*en banc*) (*Culver II*). In that case, the Court set forth a four-step process for determining lost wages as follows: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value. *Id*. at 517; Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.1 (4th ed. 2004).

An award for pain and suffering may include a sum for mental anguish and physical discomfort, and for the mental and physical effects of the injury on the plaintiff's ability to engage in those activities which normally contribute to the enjoyment of life.   Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.3 (4th ed. 2004).  An award for pain and suffering may include a sum for aggravation of a pre-existing condition.  Where the injured party would have experienced disability as a result of the pre-existing condition even if the second injury had not occurred, he can recover damages caused by the aggravating event and not the pre-existing injury.  *Id.*

Damages for pain and suffering are not subject to precise measurement.  Any amount to be awarded for pain and suffering depends, to a great extent, on the trial Court's observation of the plaintiff and its subjective determination of a reasonable amount needed to achieve full

23

compensation.  *Hyde v. Chevron U.S.A., Inc*. 697 F.2d 614, 632 (5th Cir. 1983).  An award for

pain and suffering also depends on the facts of the particular case.   Thomas J. Schoenbaum,

Admiralty and Maritime Law, §  5-15.3 (4th  ed. 2004)*; Knight v. Texaco,* 786 F.2d 1296, 1301

(5th Cir. 1986).

**FINDINGS OF FACT - Damages**

        The Court finds from all of the evidence presented in this case that Baham has suffered,

and will continue in the future to suffer, physical and mental pain as the direct and proximate

result of the injuries received by him in the September 14, 2006 accident.  Moreover, as a

direct and proximate result of the injuries Baham suffered as a result of the September 14,

2006 accident, Baham has incurred medical expenses, which were both reasonable and

necessary.  He will continue to incur medical expenses in the future as a result of this accident.

Also, as a direct result of his injuries from the September 14, 2006 accident, Baham has

suffered a loss of past wages and will suffer a future loss of wages, as his earning capacity and

ability to work have been impaired.

        As a direct result of the accident, Baham fractured the talus and calcaneus bones of his

left ankle.  He also suffered a laceration to the back of his head.  After undergoing physical

therapy, on July 26, 2007, Dr. Christopher Hebert, Baham's treating orthopedist, performed a

subtalar fusion of Baham's left ankle.  The procedure required the placement of two

orthopaedic screws.  One of the screws was surgically removed by Dr. Hebert on October 25,

2007, as a result of Baham's continued complaints of pain.  The other screw was surgically

removed by Dr. Hebert on February 12, 2009.  Baham continues to have pain in his left ankle, which is exacerbated when Baham stands for prolonged periods and when he walks on hard surfaces. Indeed, Dr. Karim opined that if Baham stands for long periods of time that would cause him pain.

An EMG performed by Dr. Karim, at the request of Dr. Hebert, revealed chronic left peroneal neuropathy.  A March 1, 2007 MRI of Baham's left knee revealed chondromalacia.

The Court assigns great weight to Dr. Hebert's testimony and accordingly, accepts his conclusions and opinions as summarized below.

Plaintiff's left knee chondromalacia pre-existed, and, accordingly, is unrelated to, Baham's September 14, 2006 accident.  However, Baham's chondromalacia is more symptomatic now because of gait disturbances and acquired atrophy which have resulted from the fracture and fusion of Baham's left ankle. Thus, this increase in Baham's left knee symptomatology are related to the September 14, 2006 accident.

The compression from Baham's September 14, 2006 fall transferred energy up to the fibular head of Baham's left knee and, accordingly, the fall caused of Baham's chronic left peroneal neuropathy which was discovered by EMG.  However, because the Court accepts Dr. Karsala's testimony that this finding has no clinical significance, the Court will disregard this finding in calculating Baham's damages.

Baham's present complaints of foot and ankle swelling, discoloration and temperature changes are consistent with some type of nerve problem, which, more probable than not, was caused by the September 14, 2006 fall.

Even considering Baham's continued complaints of foot and ankle pain and swelling and his nerve problem, Baham may return to work.  While Dr. Hebert opined that Baham may return to work at a light to medium duty status, the Court finds that light duty status, with primarily sedentary duties, is appropriate in this case.  The Court agrees with Dr. Hebert's recommendation that Baham cannot return to work in an offshore capacity, in an environment where he could be climbing stairs and ladders 15 to 20 feet above the deck, considering Baham's foot pain and swelling, fused ankle and nerve problems, due to concerns that Baham would be placing himself or others at risk.

From an orthopedic standpoint, Baham has reached maximum medical improvement as of January 21, 2009.  However, Baham's continued foot pain and swelling are likely to be permanent.

As a result of the accident at issue in this case, Baham has a permanent partial impairment of 10% of the total body, 25% of his lower extremity and 35% of his foot and ankle.

Baham will need another fusion of the transverse tarsal joints (calcaneo-cuboid and talo-navicular joints) in the future. The cost for the procedure will be $ 2400.00 plus the fee charged by the hospital.  However, whether Baham will need hardware removal after the surgery is only a medical possibility, not a probability.  Baham will also require, "at the top end", physical therapy for two to three weeks each year.

The Court also gives great weight to the testimony of Dr. Armand Kasarla, plaintiff's pain management physician, who began treating Baham on referral of Dr. Hebert, and under whose care Baham continues.  Dr. Karsala has diagnosed Baham as suffering from neuropathic pain in his left ankle, with a sympathetic component, which can be aggravated by emotional and physical stress, such as standing and walking, especially on hard surfaces, and which was caused by the fracture of Baham's ankle and subsequent surgical intervention.   The Court accepts Dr. Karsala's diagnosis and conclusion as to causation.

Although an EMG performed by Dr. Karim, at the request of Dr. Hebert, revealed chronic left peroneal neuropathy, which Dr. Hebert has related to Baham's September 14, 2006 fall, Dr. Kasarla does not believe that this finding has any clinical significance, given that Baham does not demonstrate any weakness in his left foot or numbness over the top of his left foot and ankle. Defense witness, pain management specialist Dr. Sandra Weitz agreed that Baham did not exhibit signs associated with peroneal nerve injury such as a foot drop.

Rather, Dr. Karsala attributes the pain, swelling, discoloration and temperature changes in Baham's left foot to the sympathetic component of Baham's neuropathic pain, caused by the fracture of Baham's ankle and subsequent surgical intervention.  The undersigned accepts Dr. Karsala's testimony as to the cause of Baham's present pain and associated physical manifestations (swelling, discoloration and temperature changes), as it is undisputed that these manifestations did not occur until after the September 14, 2006 accident.  Dr. Karsala's conclusion is consistent with Dr. Hebert's testimony that Baham indeed suffers from some type

27

of nerve problem which was caused by the September 14, 2006 fall.

While Dr. Weitz opined that Baham showed signs of nerve problems and symptoms of nerve damage, she refused to relate these problems to the September 14, 2006 accident.  The Court rejects the opinion as to causation given by Dr. Weitz, as her opinion and conclusion are internally inconsistent and not credible. While agreeing that Baham did not exhibit signs associated with peroneal nerve injury (foot drop), she nevertheless opined that Baham's current pain and neuropathic symptoms are the result of that condition.  Moreover, while admitting that Baham exhibited foot swelling and discoloration, which she did not dispute appeared to be "new since the accident", Dr. Weitz had no plausible explanation as to why these symptoms were unrelated to the accident.

Baham may undergo a nerve block in the future as this procedure has been recently approved by Baham's compensation insurer.  This procedure will cost approximately $3000.00 to $4000.00.  However, the Court accepts Dr. Karsala's opinion, that it is more probable than not that this nerve block will not help Baham, an opinion shared by Dr. Weitz, who agreed that nerve blocks at this point in Baham's treatment are unlikely to be successful.  Accordingly, the Court agrees with Dr. Karsala that Baham will need medical management for the remainder of his life, and, more specifically, that Baham will, more likely than not, require some medication for the remainder of his life.

Baham's current medications include Lortab, Lyrica, Ambien and Mobic at a cost of $500.00 to $600.00 per month.  Dr. Karsala believes that these medications will be continued

for a few years.  Dr. Karsala did not opine on the cost of medications after Baham's current medications are changed.  Dr. Karsala also opined that Baham will require future office visits every 4 to 6 weeks because he is on a narcotic schedule II medication.  Each visit will cost in the range of $90.00 to $120.00 per visit.

**Past Medical Expenses**

The parties stipulated that Seabright paid Baham's past medical expenses, which total $68,599.89.  The Court finds that these medical expenses were reasonable, necessary and incurred as a result of the injuries sustained by Baham in the September 14, 2006 accident. Accordingly, Seabright is entitled to recover $68,599.89 on its compensation lien for these past medical expenses. *See Hayden v. Kerr-McGee*, 787 F.2d 1000 (5th Cir. 1986) (requiring full employer reimbursement for medical benefits paid under the LHWCA out of any sum received from a negligent third party).

**Future Medical Expenses**

The evidence supports a finding that Baham will incur medical expenses in the future as a result of injuries sustained in his September 14, 2006 accident.  Both Dr. Hebert and Dr. Kasarla opined that Baham will need future medical care.  Dr. Hebert testified that Baham will need another fusion of the transverse tarsal joints (calcaneo-cuboid and talo-navicular joints) in the future, and that the cost for the procedure will be $ 2400.00 plus the fee charged by the hospital.  The plaintiff presented no evidence as to the fee which will be charged by the hospital. There is evidence in the record, however, from which these costs can be reasonably

ascertained.  Given that the hospital charged $10,280.60 for plaintiff's original fusion, and

given that the fusion of the transverse tarsal joints is less involved, the court finds that the

amount of $6000.00 is reasonable.  Although these figures have not been discounted to present

value, the Court accepts the testimony of plaintiff's economic expert, Dr. Randy Rice, that the

medical inflation rate and the discount rate offset each other.  Accordingly, the Court will

award Baham $ 8,400.00 for the costs associated with Baham's future fusion.  Because Dr.

Hebert could not determine to a reasonable medical probability that Baham will also need

hardware removal after the surgery, the costs associated with any such procedure will not be

awarded.  There being no competent evidence regarding the cost of any post-operative physical

therapy, those costs will also not be awarded.

Because both Dr. Karsala and Dr. Weitz believe that a nerve block at this point in

Baham's treatment is not likely to be successful, Baham will need medical management for the

remainder of his life, including both medications and office visits.  While Baham's current

medications cost between $500.00 to $600.00 per month, Dr, Karsala indicated that this level

of medication will be continued for only a few years.   Dr. Karsala did not opine on the cost of

medications after Baham's current medications are changed and there is no competent medical

evidence in the record upon which this Court could determine those costs.  Accordingly, the

Court finds that an award of $500.00 per month for three years is appropriate.  Dr. Randy Rice,

testified that in today's dollars, given that the medical inflation rate and discount rate offset

each other, the yearly cost of medications at $500.00 per month is $6,000.00.  Accordingly, the

Court will award Baham $18,000.00 for his future medications.

Dr. Karsala also opined that Baham will require future office visits every 4 to 6 weeks and that each visit will cost in the range of $90.00 to $120.00 per visit. However, that frequency of office visits was justified because Baham is currently on a narcotic schedule II medication.  The Court has determined that three years is an appropriate estimate of the length of time that Baham will continue on his current medications, which include a narcotic schedule II medication.  There is no competent medical evidence that after this three year period Baham will need a narcotic schedule II medication.  As such, the Court cannot determine the frequency of Baham's office visits after this three year period has passed.  Dr. Rice testified that the yearly cost of office visits every two months at the cost of $100.00 per visit is $600.00 (in present day dollars).  Accordingly, the Court will award Baham $1,800.00 for future office visits.

Based on the above, Baham will be awarded a total of $28,200.00 for future medical expenses.

**Pain and Suffering**

The evidence supports a finding that Baham suffered both mental and physical pain as a result of his left ankle injury and that he is likely to suffer additional physical pain in the future.  As a result of his fourteen foot fall, Baham suffered a five inch laceration on the back of his head, and two broken bones in his ankle requiring a fusion and two additional screw removal surgical procedures.  He will also undergo an additional fusion at a future time.

31

Moreover, he has ankle neuropathic pain with a sympathetic component.

After his fall, Baham lay on the deck of the Dolphin 109 for approximately two hours without any pain medication.  Baham has suffered pain in his ankle since the September 14, 2006 accident and he continues to suffer from intermittent ankle pain, foot swelling and discoloration. Baham testified as to these physical changes.  These changes were confirmed by photographs taken immediately after Baham's 2008 functional capacity examination (FCE), and were also confirmed by Dr. Kasarla on physical examination. Baham's pain is increased when he stands for prolonged periods of time and walks on hard surfaces; the pain also worsens as the day progresses.

As a result of his ankle injury, Baham now walks with a limp and wears an ankle brace. He walks with shorter steps and experiences balance problems.  Plaintiff also suffers from knee pain which has resulted from his changed gait and exacerbation of his pre-existing chondromalacia.

Prior to his accident, Baham enjoyed grocery shopping and taking walks with his wife, and exercising with his wife and son.  However, as a result of his ankle injury, Baham is no longer able to fully engage in these activities.  Although he is able to fish, those outings have been substantially shortened.  The Court was not impressed with the surveillance video presented by the defense.  Baham admitted both hunting and fishing.  Moreover, as noted by Dr. Karsala, the video confirmed Baham's limp and changed gait, confirmed that Baham puts more weight on the right foot than on the left foot, and, further that he avoids putting weight on

32

the left lower extremity.  The video also confirms that Baham loses his balance, as demonstrated when Baham attempting to climb the bank unassisted.  After observing Baham's demeanor, and that of his wife, when testifying about these changes in Baham's lifestyle at trial, the Court is convinced that Baham's limitations will have a significant effect on his future lifestyle.

The Court therefore finds that a fair and reasonable amount to compensate the plaintiff for his past, present and future pain and suffering and his past present and future inability to engage in those activities which previously contributed to the enjoyment of his life is $250,000.00 ($125,000.00 of which amount is attributable to the time prior to trial and $125,000.00 is allotted for the future).

**Economic Losses**

Both Baham and Nabors presented expert reports from vocational rehabilitation counselors and economists, calculating Baham's past lost wages and future loss of earning capacity.  With the exceptions listed below, the Court credits the net, after tax estimates of Baham's expert economist, Dr. Randy Rice, based on a future ability to earn $10.00 per hour.

The Court also accepts the testimony of plaintiff's vocational rehabilitation counselor, Stephanie Chalfin, which is fully supported by the evidence adduced at trial and the Court's observation of Mr. Baham's current physical state, that Baham's economic losses should be based on the assumption that he cannot return to offshore work.  This finding is consistent with the testimony of Dr. Hebert and Dr. Karsala, both of whom agree that Baham cannot return to

work in an offshore capacity, as well as the testimony of Seatrax Lafayette branch manager

Daniel Wade Godeaux, who testified that in his current physical state, Baham cannot perform

the tasks necessary to be a crane mechanic, referred to in the industry as a "crane monkey" due

to the physical demands of the job.

Moreover, the Court finds that Baham will not be employable as either a shop foreman

or crane supervisor, as suggested by Nabors, given his inability to be on his feet for long

periods of time, especially on hard surfaces, and his limitations with respect to climbing and

maintaining balance.

In support of this finding the Court accepts the testimony of Mr. Godeaux and Ms.

Chalfin.  Godeaux testified that the duties of a shop foreman require the person to be on his

feet, monitoring the work of the mechanics, as well as doing the work of a mechanic.  Ms.

Chalfin likewise testified that, to be a successful shop foreman, requires an ability to be on

your feet all day watching the technicians.  For similar reasons, Chalfin opined Baham cannot

be employed as a crane supervisor because, while the physical demands of the job would be

less than that of a crane mechanic, the person must nevertheless be able to do the physical

aspects of the work, which Baham cannot.

While Nabors places great weight on the Functional Capacity Examination (FCE)

performed by Richard Bunch, Ph.D., the Court cannot accept the findings or conclusions

presented therein for several reasons.  First, the examination was performed over one year prior

to trial and before Baham had his second screw removal surgery.  Moreover, while Dr. Bunch

34

opined that Baham was capable of repetitive climbing and standing at lengths, it is uncontroverted that following the examination, Baham's foot swelled and became discolored. This physical finding was documented by photographs taken of Baham's foot following the FCE and the testimony of both Baham and his wife.

Dr. Bunch agreed that if Baham was exhibiting the types of problems depicted in the photographs, that would indicate that Baham "did a little too much" during the examination. Dr. Bunch further agreed that if these complaints persisted and were documented (as they have been in this case by Dr. Karsala), another functional capacity evaluation would have to be performed.  Consistent with this testimony, Ms. Chalfin opined that if Baham was still exhibiting those symptoms depicted in the photograph taken after the FCE, the FCE taken one year earlier was no longer valid.  The Court agrees fully with this assessment.  The functional capacity examination done in July 2008 is simply no longer valid given Baham's current documented symptoms.

The Court also accepts Ms. Chalfin's finding that Baham will be employable in the future in an environment where he would be sitting down a good part of the day.  Such jobs would include jobs as a counter clerk, parts clerk, shipping and receiving clerk, or customer service representative in an industrial setting.  According to Ms. Chalfin, the entry level wage for these positions, considering Baham's skill level, would be in the range of $8.00 to $11.00 an hour.  Given the testimony of Seatrax payroll employee Karen Rogers and office manager Cindy Gautreaux, that clerical workers are paid on the average $10.00 an hour, and given Baham's exemplary past work ethic, the Court finds that Baham will be capable of obtaining

employment at $10.00 an hour.

The Court additionally finds that although Baham is currently receiving wages for clerical work he is performing at Seatrax, after this lawsuit has been resolved, it is more likely than not, that Baham will no longer be employed by Seatrax.  While Lafayette branch manager Godeaux stated that there had not been a decision as to whether Baham would be terminated, plaintiff's vocational rehabilitation counselor, Stephanie Chalfin, testified that she had discussed Baham's future with Godeaux and that he had indicated to her that, more likely than not, Seatrax would not continue Baham's employment in his present capacity after this lawsuit has been resolved.  She further testified that this is her usual experience with injured persons in similar situations.  The Court accepts Ms. Chalfin's testimony on this point.

**Past Lost Wages**

Baham is entitled to any wages that he would have earned had he continued to work as a crane mechanic through the date of trial, less any wages he actually earned.

On September 14, 2006, Baham was earning $20.00 per hour as a crane mechanic. The testimony of Seatrax Lafayette branch manager Daniel Wade Godeaux supports a finding that, had Baham been able to continue his employment as a crane mechanic for Seatrax, in July 2008, Baham would have received an increase in his salary to at least $21.00 per hour.  The Court accepts this testimony.  Employing this assumption, and further assuming that all sums paid by Seatrax to Baham following the accident (as reflected by Baham's income tax records) were "true" wages, as opposed to workers' compensation payments, plaintiff's expert

36

economist, Dr. Randy Rice, calculated Baham's past lost wages to be $26,123.00.

Dr. Rice further testified that this number did not reflect any changes to Baham's pay which may have occurred as a result of increases in the amount of overtime worked by crane mechanics.  Godeaux testified that last year, one of Seatrax' clients required an increased amount of services and that the hours of the mechanics assigned to that account increased substantially, with the "top guys" making $100,000.00 to $140,000.00.  He further testified that Baham would "definitely" have been assigned to that account because of his prior experience with those cranes.  However, there was abundant evidence presented that work in the oil industry is highly cyclical and unpredictable.  There is no way for the court to know whether or not Baham would have continued working for this particular client or not.  The court cannot award damages which are merely speculative.

Finally, Dr. Rice testified that in the event any of the sums received by Baham following the accident constituted workers' compensation benefits rather than true wages, those amounts should be added to Baham's past wage loss award because any such amounts would not be true wages earned by Baham.  The parties stipulated that after the accident Seatrax paid Baham "wages" in the gross amount of $106,810.00 and the net amount of $90,025.06.  For the following reasons, from the evidence presented, the Court finds that $26,702.50 paid by Seatrax to Baham constituted "true" wages and that the remaining $80,107.50 constituted workers' compensation benefits, for the following reasons.

The LHWCA provides an injured plaintiff with an immediate and readily available compensation payment from his employer while not precluding any action the plaintiff may have against any third-party tortfeasor. *McLeod v. ERA Aviation, Inc.*, 1996 WL 80086, *2 (E.D.La. 1996) *citing Bloomer v. Liberty Mut. Ins. Co.*, 100 S. Ct 925, 932 (1980). However, an employee is not entitled to double recovery under the LHWCA. *Id*. To this end, the LHWCA allows for an employee to elect either to receive compensation or to recover damages against a third person. 33 U.S.C. §933(a). By bringing this suit, Baham has chosen to recover damages which may be payable because of the fault of Nabors.

Seatrax argues that the payments made to Baham were advance compensation payments in the form of wages in lieu of compensation.  With the exception of a portion of the sums noted below, the Court agrees.  An employer need not label the payments made to an employee as advance compensation in order to receive a credit for such payments. *Id. citing MacCabe Inspection Service v. Willard*, 240 F.2d 942, 943 (2nd Cir. 1957).  The Fifth Circuit has held that the key in determining whether payments made to an employee are characterized as "true" wages or wages in lieu of compensation is the intent of the employer. *Shell Offshore, Inc*., 122 F.3d 312, 317-318 (5th Cir. 1997).   While the above caselaw does not deal specifically with the right of an employer to recover such payments from a third party, the Court finds that the same principle should apply to an employer as applies to an insurer who makes compensation payments.  If an insurer is entitled to a future credit on amounts due an injured employee, the employer is entitled to recover these amounts from a third party tortfeasor.

38

The evidence established that the majority of the disputed payments made to Baham by Seatrax were wages in lieu of compensation.  At the time of the accident, Baham was earning $20.00 per hour as a crane mechanic, and, as a result of the injuries sustained by Baham in the September 14, 2006 accident, Baham was unable to return to work in that capacity. However, following the accident, Baham continued to work for Seatrax in a clerical capacity. Nevertheless, Seatrax paid Baham at his basic crane mechanic pay rate.  Seatrax' intention to pay compensation benefits was established by the testimony of Seatrax office manager Cindy Gautreaux, who confirmed that, in order to keep their workers' compensation premiums down, Seatrax agreed to pay Baham wages in lieu of compensation, relieving Seabright of that obligation.  Thus, Seabright would pay Baham's medical expenses, while Seatrax would cover Seabright's workers' compensation indemnity obligations.

Moreover, Gautreaux conferred with Seabright adjusters, who calculated Baham's average hourly weekly wage, to determine the proper amount of each indemnity payment. This agreement was further confirmed by October 9, 2006 letter to the United States Department of Labor enclosing form LS-202, and by the testimony of Seatrax Lafayette branch manager, Daniel Wade Godeaux.  Seatrax payroll employee Karen Rogers verified the amount of each payment; Seatrax paid Baham for 55 hours of work, 40 hours at $20.00 per hour and the remainder at Baham's overtime rate.

While an employer is permitted to receive reimbursement upon election of damages by the plaintiff-employee, an employer is not entitled to recoupment of any overpayment as such

payments are not considered compensation for purposes of the LHWCA. *See Id. citing Fleetwood v. Newport News Shipbuilding and Dry Dock Co.*, 16 B.R.B.S. 282, BRB No. 81-690 (1984). Likewise, if an employee actually earns the wages paid to him, they should not be considered wages in lieu of compensation as such wages are generally understood as representing earned wages. *See Feyerabend v. Boomtown Casino*, 9 So.2d 228 (La. App. 5th Cir. 2009) (interpreting Louisiana law).

In this case, it is clear that Baham actually performed clerical work following his accident and, thus, actually earned a portion of the wages paid by Seatrax in lieu of compensation. Godeaux testified that on only about two occasions was Baham able to work a full 40 hour week, and, instead, Baham averaged working approximately 20 to 25 hours per week. Thus, Baham actually *worked* approximately fifty percent of the time for which he was paid by Seatrax in lieu of compensation, doing clerical work. Furthermore, both Rogers and Gautreaux testified that clerical workers only earn an average of $10.00 per hour; Baham was paid double that rate.

Given the above facts and testimony, which are accepted by this Court, in order to avoid recoupment of any overpayment to Baham by Seatrax, and a double recovery by Baham, the Court finds that half of the total $106,810.00 ($53,405.00) paid by Seatrax, represents compensation benefits in the form of wages paid in lieu of compensation. Furthermore, the Court finds that, assuming the average clerical worker earns $10.00 per hour and the majority of Baham's hourly wage was at a rate of $20.00 per hour, Baham actually earned only

40

approximately half of the remaining $53,405.00, or $26,702.50, as "true" wages for the work he performed.  Baham's past wage loss award therefore will be reduced by the $26,702.50 which he actually earned working as a clerical employee.  The remaining $80,107.50 represents benefits paid to Baham in lieu of compensation.

Thus, in accordance with Dr. Rice's testimony, Baham will be awarded $106,230.50 for past lost wages.[3]

**Intervention Issues**

Seabright and Seatrax have intervened in this lawsuit in order to obtain a lien on any award the plaintiff may recover from Nabors, as well as a credit against future LHWCA benefits from Baham's net recovery.

The parties stipulated that Seabright made indemnity payments under the LHWCA (through the date of trial) in the amount of $11,800.00. The parties further stipulated that these indemnity payments were reasonable and necessary and incurred as a result of the injuries sustained by Baham in the September 14, 2006 accident.  Accordingly, Seabright  is entitled to recover $11,800.00 on its compensation lien for these indemnity payments. *Miller v. Rowan Companies, Inc.,* 815 F.2d 1021, 1028 (5th Cir. 1987)*.*

In light of the above analysis, the Court also finds that $80,107.50 of the total $106,810.00 paid by Seatrax to Baham  represent workers' compensation benefits in the form of  wages in lieu of compensation paid by Seatrax.  This amount shall therefore be awarded to

---

[3]Because of the intervention by Seatrax, discussed below, Baham will not receive a double recovery with respect to the $80,107.50 in benefits paid to Baham in lieu of compensation.

Seatrax in satisfaction of its compensation lien.[4]

**Future Wage Loss**

Baham's expert economist, Dr. Randy Rice, estimated that Baham's total work-life expectancy at trial was 12.98 years.  The Court accepts this estimate.

Had Baham not been injured, Baham would have continued to be a crane mechanic for the remainder of his work life.  Moreover, Baham would have received an increase in his salary to at least $21.00 per hour.

Assuming this rate of pay ($21.00 per hour), employing a below discount market rate of 2%, Dr. Rice calculated Baham's total lost wages, for the remainder of his work life expectancy in today's dollars after taxes to be $728,530.00.  Using these same assumptions, Dr. Rice further testified that the present value of Baham's future employment at $10.00 per hour, 40 hours per week, 52 weeks per year is $231,567.00.  Thus, Baham's net, after tax, future wage loss, discounted to present value is $496,963.00.  The Court accepts Dr. Rice's testimony and therefore awards Baham $496,963.00 for his future loss of wages.

**PREJUDGMENT INTEREST**

Under maritime law, an award of pre-judgment interest on past damages "is the rule rather than the exception, and, in practice, well-nigh automatic." *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir.1986); *Couch v. Cro-Marine Transport, Inc*., 44 F.3d

---

[4]Baham argues that Seatrax is not entitled to recover this amount.  However, Seatrax paid these benefits to Baham, and to not allow Seatrax this recovery would result in a double recovery by Baham.  It should also be noted that if this amount were to be considered as earned wages, Baham's past wage loss award would be reduced.

319, 328 (5th Cir. 1995).  A trial court only has the discretion to deny pre-judgment interest where peculiar circumstances would make such an award inequitable. *Reeled Tubing*, 794 F.2d at 1028.

The general rule is that prejudgment interest is to be awarded from the date of the casualty to ensure the plaintiff is compensated in full. *See Probo II London v. M/V Isla Santay*, 92 F.3d 361 n. 2 (5th cir.1996); *Reeled Tubing*, 794 F.2d at 1028; *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 115 S.Ct. 2091, 2095-2096 (1995).  It is within the discretion of the Court to select an equitable rate of pre-judgment interest, and the court may look to reasonable guideposts. *Harrison v. Diamond Offshore Drilling, Inc.*, 2008 WL 708076, *24 (E.D. La. 2008) *citing Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991); *Reeled Tubing*, 794 F.2d at 1029.

The Court finds that an award of prejudgment interest from the date of plaintiff's accident (September 14, 2006) is appropriate in this case at the rate of 1.125%, which is the most recently quoted rate for three-year treasury notes, on the plaintiff's past damages as a described above (past lost wages and past pain and suffering).  www.treasurydirect.gov and *Couch*, 44 F.3d at 328 (a district court may not award prejudgment interest on future damages).

**SUMMARY**

On the basis of the foregoing findings of fact and conclusions of law, the Court finds

that the plaintiff is entitled to recover the following damages:

| | |
|---|---|
| Past Lost Wages | $106,230.50 |
| Future Lost Wages | $496,963.00 |
| Past Medical Expenses | $68,599.89 |
| Future Medical Expenses | $28,200.00 |
| Past Pain and Suffering | $125,000.00 |
| Future Pain and Suffering | $125,000.00 |
| Total | $949,993.39 |

Out of the above amounts intervener, Seabright is entitled to recover $80,399.09

($68,599.89 - medical expenses and $11,800.00 - indemnity payments) on its lien for benefits

paid to Baham under the LHWCA.

Of the above amounts, intervener Seatrax is entitled to reimbursement of $80,107.50

for compensation benefits in the form of wages paid in lieu of compensation paid to Baham

pursuant to the LHWCA.

Because the Court has found Baham 50% contributorily negligent or at fault, the

defendant will bear 50 % of the entire cost of the judgement.  Baham and interveners are

entitled to pre-judgment interest on past damages from the date of the accident, September 14,

2006, until the date paid, calculated at the rate of 1.125%.  Further, plaintiff is entitled to post-

judgment interest at the legal rate on all remaining damages from the date of judgment until the date paid.  All parties are to bear their own costs.  The parties shall submit a Judgment to the Court in accordance with the above findings and conclusions, with all parties agreeing as to the form of the judgment, within ten (10) days.

## MOTION TO ADMIT POST-ACCIDENT RECONFIGURATION

Plaintiff  filed a Motion to admit evidence of the post-accident reconfiguration of the ladder to access the walkway surrounding the crane pedestal. [rec. doc. 93].  Nabors filed opposition, to which Baham filed a Reply. [rec. docs. 97 and 105].  The Motion was pretermitted until trial. [rec. doc. 114].

Given that given that this case was tried as a bench trial, and that the Court has not relied on any post-accident reconfiguration evidence in rendering the instant Findings of Fact and Conclusions of Law, the plaintiff's Motion to Admit evidence of Post-Accident Reconfiguration [rec. doc. 93] is **dismissed as moot**.

THUS DONE AND SIGNED June 28, 2010, Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE